1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

DAVID T. SUMNER, IV,

Plaintiff,

v.

JO ANNE B. BARNHART, Commissioner of
Social Security,

Defendant.

CASE NO. C04-5387KLS

ORDER AFFIRMING THE
COMMISSIONER'S DECISION
TO DENY BENEFITS

Plaintiff, David T. Sumner, IV, has brought this matter for judicial review of the denial of his applications for disability insurance and supplemental security income ("SSI") benefits. The parties have consented to have this matter be heard by the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(c), Federal Rule of Civil Procedure 73 and Local Magistrates Rule 13. After reviewing the parties' briefs and the remaining record, the undersigned hereby finds and ORDERS as follows:

FACTUAL AND PROCEDURAL HISTORY

Plaintiff currently is thirty-five years old.[1] Tr. 22. He has a high school education and completed training as a carpenter's apprentice. Tr. 65. He has past work experience as a cook, carpenter, machine operator, and laborer. Tr. 17, 73.

---

[1] Plaintiff's date of birth has been redacted in accordance with the General Order of the Court regarding Public Access to Electronic Case Files, pursuant to the official policy on privacy adopted by the Judicial Conference of the United States.

REPORT AND RECOMMENDATION
Page - 1

Plaintiff protectively filed applications for disability insurance and SSI benefits on July 25, 2002, alleging disability as of December 20, 2000, due to pain and other symptoms involving his lower back and feet. Tr. 12, 48-50, 59, 289-91.  Both of his applications were denied initially and on reconsideration. Tr. 22-28, 30-32, 292-301.  Plaintiff requested a hearing, which was held on October 29, 2003, before an administrative law judge ("ALJ"). Tr. 302.  At the hearing, plaintiff, represented by counsel, appeared and testified, as did plaintiff's mother and a vocational expert. Tr. 302-334.

On April 15, 2004, the ALJ issued a decision finding plaintiff not disabled. Tr. 18-20.  Specifically, the ALJ found in relevant part as follows:

(1)     at step one of the disability evaluation process, plaintiff had not engaged in substantial gainful activity since his alleged onset date of disability;

(2)     at step two, plaintiff had "severe" impairments consisting of a lumbar strain with degenerative changes at L4-5-S1, an adjustment disorder, a pain disorder, and a personality disorder;

(3)     at step three, none of plaintiff's impairments met or equaled the criteria of any of those listed in 20 C.F.R. Part 404, Subpart P, Appendix 1;

(4)     at step four, plaintiff had the residual functional capacity to perform a modified range of medium work, which precluded him from performing his past relevant work; and

(5)     at step five, plaintiff was capable of performing other work existing in significant numbers in the national economy.

Tr. 19-20.  Plaintiff's request for review was denied by the Appeals Council on May 22, 2004, making the ALJ's decision the Commissioner's final decision. Tr. 4-6; 20 C.F.R. §§ 404.981.

On July 6, 2004, plaintiff filed a complaint in this court seeking review of the ALJ's decision. (Dkt. #1).  Plaintiff argues that decision should be reversed and remanded for an award of benefits, because the ALJ erred in finding he has the residual functional capacity to perform other work existing in significant numbers in the national economy.  Specifically, plaintiff asserts that in so finding the ALJ: (a) improperly evaluated the medical evidence in the record; (b) erred in assessing plaintiff's credibility; and (c) erred in assessing the credibility of plaintiff's mother.  For the reasons set forth below, however, the undersigned finds the ALJ properly determined plaintiff to be not disabled.

<u>DISCUSSION</u>

This court must uphold the Commissioner's determination that plaintiff is not disabled if the Commissioner applied the proper legal standard and there is substantial evidence in the record as a whole to

1   support the decision.  Hoffman v. Heckler, 785 F.2d 1423, 1425 (9th Cir. 1986).  Substantial evidence is

2   such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  Richardson

3   v. Perales, 402 U.S. 389, 401 (1971); Fife v. Heckler, 767 F.2d 1427, 1429 (9th Cir. 1985).  It is more than

4   a scintilla but less than a preponderance.  Sorenson v. Weinberger, 514 F.2d 1112, 1119 n.10 (9th Cir.

5   1975); Carr v. Sullivan, 772 F. Supp. 522, 524-25 (E.D. Wash. 1991).  If the evidence admits of more than

6   one rational interpretation, the court must uphold the Commissioner's decision.  Allen v. Heckler, 749 F.2d

7   577, 579 (9th Cir. 1984).

8   I.      The ALJ Properly Assessed Plaintiff's Residual Functional Capacity

9           To determine whether a claimant is entitled to benefits, the ALJ engages in a five-step sequential

10   disability evaluation process. 20 C.F.R. § 416.920.  If, at step three of this evaluation process, a disability

11   determination "cannot be made on the basis of medical factors alone," the ALJ then must identify the

12   claimant's "functional limitations and restrictions" and assess his or her "remaining capacities for work-

13   related activities." SSR 96-8p, 1996 WL 374184 *2.  A claimant's residual functional capacity assessment is

14   used at step four to determine whether he or she can do his or her past relevant work, and at step five to

15   determine whether he or she can do other work. Id.  The claimant's residual functional capacity assessment

16   thus is what he or she "can still do despite his or her limitations." Id.

17           A claimant's residual functional capacity is the maximum amount of work the claimant is able to

18   perform based on all of the relevant evidence in the record. Id.  However, a claimant's inability to work

19   must result from his or her "physical or mental impairment(s)." Id.  The ALJ, therefore, must consider only

20   those limitations and restrictions "attributable to medically determinable impairments." Id.  In assessing a

21   claimant's residual functional capacity, the ALJ also is required to discuss why the claimant's "symptom-

22   related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the

23   medical or other evidence." Id. at *7.

24       The ALJ assessed plaintiff with the following residual functional capacity:

25       [T]he claimant has retained the residual functional capacity to lift and carry 40 pounds
         on occasion and 25 pounds frequently.  He can sit and stand/walk 6 hours each in an 8-
26       hour workday, and occasionally climb ladders, ropes and scaffolds, bend, crouch, kneel,
         stoop, and crawl.
27
         The claimant's mental impairments cause mild limitations at daily living activities,
28       moderate difficulty with social functioning, concentration, persistence and pace, and no
         episodes of decompensation.  With respect to specific areas of functioning, he can

1    perform simple 1-2-3 step tasks and should have limited interaction with the public.

2    Tr. 17.  Plaintiff argues the above residual functional capacity assessment fails to take into account several

3    other mental and physical limitations found by his physicians.  To the extent the ALJ failed to include any

4    such limitations, however, that failure was harmless.

5          The ALJ is responsible for determining credibility and resolving ambiguities and conflicts in the

6    medical evidence. Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998).  Where the medical evidence in the

7    record is not conclusive, "questions of credibility and resolution of conflicts" are solely the functions of the

8    ALJ. Sample v. Schweiker, 694 F.2d 639, 642 (9th Cir. 1982).  In such cases, therefore, "the ALJ's

9    conclusion must be upheld." Morgan v. Commissioner of the Social Security Administration, 169 F.3d 595,

10   601 (9th Cir. 1999).  Determining whether inconsistencies in the medical evidence "are material (or are in

11   fact inconsistencies at all) and whether certain factors are relevant to discount" the opinions of medical

12   experts "falls within this responsibility." Id. at 603.

13         In resolving questions of credibility and conflicts in the evidence, an ALJ's findings "must be

14   supported by specific, cogent reasons." Reddick, 157 F.3d at 725.  The ALJ can do this "by setting out a

15   detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation

16   thereof, and making findings." Id.  The ALJ also may draw inferences "logically flowing from the evidence."

17   Sample, 694 F.2d at 642.  Further, the court itself may draw "specific and legitimate inferences from the

18   ALJ's opinion." Magallanes v. Bowen, 881 F.2d 747, 755, (9th Cir. 1989).

19         The ALJ must provide "clear and convincing" reasons for rejecting the uncontradicted opinion of

20   either a treating or examining physician. Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1996).  Even when a

21   treating or examining physician's opinion is contradicted, that opinion "can only be rejected for specific and

22   legitimate reasons that are supported by substantial evidence in the record." Id. at 830-31.  However, the

23   ALJ "need not discuss all evidence presented" to him or her. Vincent on Behalf of Vincent v. Heckler, 739

24   F.3d 1393, 1394-95 (9th Cir. 1984) (citation omitted) (emphasis in the original).  The ALJ must only explain

25   why "significant probative evidence has been rejected." Id.; see also Cotter v. Harris, 642 F.2d 700, 706-07

26   (3d Cir. 1981); Garfield v. Schweiker, 732 F.2d 605, 610 (7th Cir. 1984).

27         In general, more weight is given to a treating physician's opinion than to the opinions of those who

28   do not treat the claimant. Lester, 81 F.3d at 830.  On the other hand, an ALJ need not accept the opinion of

REPORT AND RECOMMENDATION
Page - 4

a treating physician, "if that opinion is brief, conclusory, and inadequately supported by clinical findings." Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002); Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001); Magallanes, 881 F.2d at 75.  An examining physician's opinion is "entitled to greater weight than the opinion of a nonexamining physician." Lester, 81 F.3d at 830-31.  A nonexamining physician's opinion may constitute substantial evidence if "it is consistent with other independent evidence in the record." Id. at 830-31; Tonapetyan, 242 F.3d at 1149.

> A.    Dr. Takacs

Plaintiff argues the ALJ erred by not adopting all of the work-related functional limitations found by his treating physician, Dr. John P. Takacs.  In his most recent opinion regarding plaintiff's work-related functional limitations, dated December 13, 2001, Dr. Takacs stated:

> Work limits as follows: 40 pounds of lifting, minimize bending and twisting at the waist. Only occasional squatting and no extensive use of ladders or climbing.  Can sit no more than 45 minutes at a time before being able to get up and move around to stretch.  The recommendation is for a change to new work within these capacities.

Tr. 203.  With respect to Dr. Takacs opinion, the ALJ found as follows:

> This report is by a treating source after multiple examinations of the claimant, and it is given substantial weight.  However, the evidence does not show that the claimant needs to alternate positions every 45 minutes.  Dr. [Darrell C.] Brett's determination of a 2-hour limit is more reasonable, in light of the claimant's daily activities and his observed ability to sit comfortably.  The claimant does not need to shift positions more frequently than can be accommodated by typical work breaks.

Tr. 15.  Specifically, plaintiff argues that the ALJ improperly rejected Dr. Takacs' opinion regarding his need to alternate positions every 45 minutes, and that the ALJ erred by not providing any rationale for rejecting the limitation that plaintiff minimize twisting at the waist.

As noted above, the ALJ did not accept Dr. Takacs' opinion that plaintiff would need to alternate positions every 45 minutes, finding the determination of Dr. Brett, a specialist in neurological surgery for the spine, regarding plaintiff's ability to alternate positions "more reasonable." Id.  In mid-July 2005, Dr. Brett examined plaintiff, and recommended in relevant part that he not "be required to sit or stand in a stationary position for more than two consecutive hours." Tr. 187.  While Dr. Takacs is plaintiff's treating physician, it is also true that more deference is given to the "opinion of a specialist about medical issues related to his or her area of specialty" than to those who are not specialists. Benecke v. Barnhart, 379 F.3d 587, 594 n.4 (9th Cir. 2004) (citing 20 C.F.R. § 404.1527(d)(5)).

Given these conflicting opinions, therefore, it was not unreasonable for the ALJ to find the opinion of Dr. Brett on this issue more persuasive.  This is particularly so in light of the other medical evidence in the record.  For example, both of the non-examining consulting physicians who assessed plaintiff's residual functional capacity, found him capable of sitting and standing and/or walking about six hours each in an 8-hour day with normal breaks. Tr. 230, 244; <u>Lester</u>, 81 F.3d at 830-31; <u>Tonapetyan</u>, 242 F.3d at 1149 (non-examining physician's opinion may constitute substantial evidence if consistent with other independent evidence in record).  No other physician, furthermore, found plaintiff to require any greater restrictions on his ability to sit, stand or walk.  Thus, the substantial evidence in the record supports Dr. Brett's opinion more than it does the opinion of Dr. Takacs.

Plaintiff also argues, however, that the other reasons provided by the ALJ for rejecting the opinion of Dr. Takacs on this issue are not valid.  The undersigned does agree the ALJ did not sufficiently specify the daily activities the ALJ believed contradicted Dr. Takacs' opinion. Tr. 15.  However, the ALJ still was correct in rejecting Dr. Takacs' opinion based on the findings of Dr. Brett.  While it also is true the ALJ did not specify who he was referring to regarding plaintiff's "observed ability to sit comfortably," Dr. William S.T. Mayhall did note in late November 2001, that he sat "comfortably during the examination." Tr. 15, 254.  It thus is logical to infer it is Dr. Mayhall's opinion to which the ALJ is referring. <u>See</u> <u>Magellanes</u>, 881 F.2d at 755 (court may draw specific and legitimate inferences from ALJ's opinion).  Further, although both plaintiff and his mother have reported and testified as to his inability to sit and other pain symptoms, as discussed below, the ALJ properly discounted their credibility.

Plaintiff further argues the ALJ erred in not providing any rationale for excluding from his residual functional assessment Dr. Takacs' limitation that he should minimize twisting. Tr. 203.  Dr. Harold G. Lee also opined in late September 2002, that plaintiff "probably" could not "tolerate repetitive motion of back for twisting and bending on a consistent basis." Tr. 242.  Although no other medical source in the record has so limited plaintiff, and he has been noted to have fairly good range of motion, back flexion/extension and hip rotation on several occasions (Tr. 186, 255, 261, 266-67, 275), the ALJ did not address this issue.  Nevertheless, as explained below, such error was harmless.

B.    <u>Dr. Brett</u>

With respect to plaintiff's ability to work, Dr. Brett opined in mid-July 2001, as follows:

> I feel that he is medically stationary for all intents and purposes with a moderate permanent partial disability in that he should not be required to lift or carry more than 35 lbs., perform any repetitive lifting, bending or stooping, or be required to sit or stand in a stationary position for more than two consecutive hours.

Tr. 187.  In his decision, the ALJ stated that he gave Dr. Brett's opinion "some weight." Tr. 15.  Plaintiff asserts that despite this statement, the ALJ did not include in his residual functional capacity assessment the thirty-five pound weight and repetitive lifting restrictions.

Again, it is entirely appropriate for the court to draw "specific and legitimate inferences from the ALJ's opinion." Magallanes, 881 F.2d at 755.  Here, it is clear the ALJ evaluated the medical evidence in the record concerning plaintiff's weight limitations, and found Dr. Takacs' forty pound restriction to be more reasonable. Tr. 15.  In other words, on this issue, the ALJ considered the opinions of both Dr. Brett and Dr. Takacs, and determined Dr. Takacs's opinion to be more persuasive. Reddick, 157 F.3d at 722 (ALJ is responsible for resolving conflicts in medical evidence).

Other medical evidence in the record also supports the ALJ's finding.  For example, Dr. Mayhall felt plaintiff could perform at the light to medium level of work (which requires the ability to lift up to fifty pounds). Tr. 258; see 20 C.F.R. §§ 404.1567(c), 416.967(c).  Indeed, the two non-examining consulting physicians in the record opined that plaintiff could lift up to fifty pounds. Tr. 230, 244.  Although there are other opinions in the record that limited plaintiff to lifting less than thirty-five pounds (Tr. 242, 277, 280), as discussed below, the ALJ properly rejected those greater lifting limitations.  Further, Dr. Kevin J. Kane noted there generally was "a consensus that a 40-pound lift limit be placed." Tr. 281.  As such, the ALJ did not err in using the forty-pound weight limit.

For similar reasons, the ALJ also did not err in declining to include in plaintiff's residual functional capacity assessment Dr. Brett's restriction on repetitive lifting.  No other physician in the record, including Dr. Takacs, opined that plaintiff required such a limitation.  In addition, as noted above, the weight of the medical evidence in the record shows plaintiff is able to lift up to forty pounds at a time.  As the substantial evidence in the record does not indicate plaintiff should be restricted from performing repetitive lifting, the ALJ did not err in rejecting that restriction.

C.    Dr. Lee

In late September 2002, Dr. Lee opined that plaintiff probably was "ready for any sedentary work," and that he probably could not "tolerate repetitive motion of back for twisting and bending on a constant

1    basis." Tr. 242.  The ALJ again gave Dr. Lee's opinion "some weight," but stated that "in light of the mild

2    findings, an assessment of sedentary work is not well supported." Tr. 15.  Plaintiff argues the ALJ did not

3    provide specific or legitimate reasons for rejecting Dr. Lee's opinion, but instead improperly substituted his

4    own opinion for that of Dr. Lee.  The undersigned disagrees.

5          It is not entirely clear whether in stating "in light of the mild findings," the ALJ was referring to the

6    findings of Dr. Lee or those contained in the record as a whole.  In either case, however, the ALJ's findings

7    are supported by substantial evidence.  In the same report in which he limited plaintiff to sedentary work,

8    Dr. Lee noted that plaintiff was in no acute distress, and that he had normal deep tendon reflexes, normal

9    sensation, essentially normal motor strength, negative straight leg raising, and no muscle atrophy. Tr. 241.

10   Further, although plaintiff had some tenderness in his spine, Dr. Lee did "not see any definite clinical

11   evidence of lumbar radiculopathy or myelopathy or other nerve entrapment syndrome." Tr. 241-42.  Dr.

12   Lee continued to report similarly "mild" findings through October 2002. Tr. 235-37.

13         The weight of the other medical evidence in the record also indicates plaintiff's objective medical

14   findings were generally mild.  For example, in early January 2001, Dr. Simon K. Chan found plaintiff to be

15   in no acute distress, with only "mild tenderness" in the lumbar area of his back. Tr. 280.  Plaintiff's deep

16   tendon reflexes and straight leg raising were normal, and he had "[n]o sensory or motor deficit." Id.  In mid-

17   July 2001, Dr. Brett also found plaintiff to be in no acute distress, with no radicular pain or muscle spasm,

18   and "really unimpaired" lumbar range of movement. Tr. 186.  He was able to heel and toe walk and

19   repetitively toe stand "without difficulty," and his strength and sensation were "preserved." Id.  A lumbar

20   spine MRI showed no significant spinal canal compromise or nerve root impingement. Tr. 187.  Dr. Brett

21   thus found plaintiff to have "no radicular pain or neurologic deficit." Id.

22         Dr. Takacs consistently noted plaintiff to have no significant spinal tenderness or symptoms of

23   radiculopathy. Tr. 203, 214, 223-26.  In mid-December 2001, Dr. Takacs found plaintiff's motor sensation

24   and strength to be intact. Tr. 203.  In late July 29, 2002, he also found plaintiff to have "moderate thoracic

25   and minimal lumbar somatic dysfunction." Tr. 200.  Similarly, Dr. T. Dorman, who treated plaintiff from

26   late 2001 to late 2002, found that plaintiff had normal back flexion and extension, and that he consistently

27   improved mechanically, symptomatically and anatomically over time. Tr. 261-63, 266-67.  For example, in

28   late January 2002, plaintiff was noted to have "[v]irtually no back pain," and "[n]ormal back mobility," and

1   in early April 2002, Dr. Dorman found that "[t]here were no objective findings," and that plaintiff "was not

2   in pain when seen." Tr. 260-61.

3       In late November 2001, Dr. Mayhall noted that plaintiff's toe and heel walking were satisfactory,

4   that his "[s]quat to rise" was ninety percent, and that his back flexion and extension were fairly normal. Tr.

5   254.  Plaintiff's motor strength and sensation were intact and hip rotation caused "no pain on either side."

6   Tr. 255.  X-rays of plaintiff's spine indicated "minimal" findings, and Dr. Mayhall found "no neurologic

7   abnormality on examination." Tr. 255, 257.

8       While Dr. Gail S. Conway did find plaintiff to have "[d]iminished" lumbar spine extension and side

9   bending with pain in late June 2003. Tr. 275, 277.  On the other hand, she also noted that plaintiff had "no

10  tenderness" in his thoracic or lumbar musculature, that he had "excellent non-painful range of motion with

11  flexion at the lumbar spine," that sensation and motor function in his upper and lower extremities were

12  "completely intact," and that he had negative straight leg raising. Tr. 275.  In addition, Dr. Conway saw "no

13  evidence . . . of neurologic impairment suggesting radiculopathy." Id.

14      D.    Dr. Conway

15      Plaintiff argues the ALJ failed to provide the required rationale for rejecting Dr. Conway's opinion

16  that he be restricted to sedentary work with bending limitations. Tr. 277.  With respect to that opinion, the

17  ALJ stated that "Dr. Conway's examination showed no significant problems, inconsistent with a finding of

18  sedentary work." Tr. 16.  As discussed immediately above, while Dr. Conway did note plaintiff had pain and

19  limited range of motion with lumbar spine extension and side bending, her findings were otherwise fairly

20  minimal. Tr. 274-75, 277.  Therefore, in light of the other mild objective medical findings discussed above,

21  the ALJ did not err in rejecting Dr. Conway's limitation to sedentary work.

22      Plaintiff is correct that it is insufficient for an ALJ to reject the opinion of a treating or examining

23  physician by merely stating, without more, that there is a lack of objective medical findings in the record to

24  support that opinion. See Embrey v. Bowen, 849 F.2d 418, 421 (9th Cir. 1988).  Here, however, the ALJ

25  properly set forth "a detailed and thorough summary of the facts and conflicting clinical evidence" in the

26  record, including the reports of Dr. Conway and the opinions contained therein, stated his interpretation

27  thereof, and made appropriate findings. Tr. 14-17; Reddick, 157 F.3d at 725.

28

REPORT AND RECOMMENDATION
Page - 9

E.      Dr. Johnson

Plaintiff underwent a psychological evaluation performed by Jan G. Johnson, Ph.D. in late December 2003.  Dr. Johnson found plaintiff had adequate grooming, a normal rate of speech, and clear enunciation. Tr. 284.  Plaintiff was oriented and denied having delusions and hallucinations. Tr. 284-85.  His affect was angry and he appeared to be dysphoric. Tr. 284.  His performance during the evaluation suggested: an adequate fund of knowledge; adequate abilities in attention and concentration; some limitations in abstract thinking; and some weakness in insight and judgment. Tr. 285.  While Dr. Johnson assessed plaintiff with a global assessment of functioning ("GAF") score of 45, he found him to be "of average intelligence with memory and attention/concentration within normal range." Tr. 287.  In terms of plaintiff's prognosis, Dr. Johnson concluded in relevant part as follows:

> Mr. Sumner's ability to return to employment is most likely contingent on the successful management and/or treatment of his medical condition.  The medical summary supplied with this referral suggests that there are few medical alternatives at this time and certainly not one that is suitable in Mr. Sumner's opinion.  As long as he continues with this point of view improvement physically or psychologically is doubtful.

Tr. 288.

With respect to Dr. Johnson's opinion, the ALJ found as follows:

> This report is carefully considered, and it documents the claimant's odd behavior and preoccupation with pain.  However, the GAF of 45 is not persuasive – the claimant is noted to have sufficient intelligence, memory, attention and concentration for working. The GAF assessment was based on subjective statements surrounding the claimant's reports of his physical condition only.  Other doctors as reviewed above do not find those limitations.  Dr. Johnson's report is not entirely persuasive.

Tr. 16.  Plaintiff argues that in addition to the restriction that he have limited interaction with the public, in light of Dr. Johnson's opinion, the ALJ also should have found he was limited in his ability to: interact with supervisors or coworkers; respond appropriately to and tolerate the pressures and expectations of a normal work setting; and exercise judgment and make decisions.

Plaintiff bases his argument on the fact that Dr. Johnson found him to be suspicious and untrusting of relationships and to have considerable hostility and anxiety, as well as both histrionic and antisocial personality traits. Tr. 286-87.  Nowhere in his report, however, does Dr. Johnson state, or even suggest, that these psychological traits have resulted in the additional mental functional limitations plaintiff argues the ALJ should have added to his residual functional capacity assessment.  Indeed, were the ALJ to have done so, he would have improperly substituted his lay opinion for that of Dr. Johnson, a qualified medical

1   professional, which plaintiff previously accused the ALJ doing with respect to Dr. Lee.

2       Plaintiff further argues that in light of Dr. Johnson's opinion the ALJ improperly found plaintiff to be

3   capable of performing "simple 1-2-3 step tasks." Tr. 17.  To support this argument, plaintiff asserts he had

4   difficulty in positioning the hands of a clock during the evaluation.  During the evaluation, Dr. Johnson had

5   plaintiff draw the hands of a clock. Tr. 285.  While plaintiff did not position the hands of the clock at the

6   prescribed time, he correctly draw the circle of a clock face and place the numbers in their prescribed

7   positions. Id.  Dr. Johnson, furthermore, noted that plaintiff was able to completed a three-step command

8   "without problems." Id.

9       Lastly, plaintiff argues Dr. Johnson's opinion shows he is unable to sustain even unskilled work,

10  stating the findings of Dr. Johnson establishes that his abilities "are severely limited in crucial areas of the

11  unskilled work abilities." Plaintiff's Reply Brief, p. 8.  These basic work abilities include the ability to:

12  understand, remember and carry out simple instructions; respond appropriately to supervisors, co-workers

13  and usual work situations; and deal with changes in a routine work setting. See 20 C.F.R. §§ 404.1521,

14  416.921.  Plaintiff, however, does not state what in the opinion or report of Dr. Johnson establishes severe

15  limitations in these abilities.  Indeed, the undersigned can find nothing in his opinion or report to support

16  plaintiff's assertion.

17  II.   The ALJ Did not Err in Assessing Plaintiff's Credibility

18      Questions of credibility are solely within the control of the ALJ.  Sample v. Schweiker, 694 F.2d

19  639, 642 (9th Cir. 1982).  The court should not "second-guess" this credibility determination.  Allen, 749

20  F.2d at 580.  In addition, the court may not reverse a credibility determination where that determination is

21  based on contradictory or ambiguous evidence.  Id. at 579.  That some of the reasons for discrediting a

22  claimant's testimony should properly be discounted does not render the ALJ's determination invalid, as long

23  as that determination is supported by substantial evidence. Tonapetyan v. Halter, 242 F.3d 1144, 1148 (9th

24  Cir. 2001).

25      To reject a claimant's subjective complaints, the ALJ must provide "specific, cogent reasons for the

26  disbelief." Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1996) (citation omitted).  The ALJ "must identify

27  what testimony is not credible and what evidence undermines the claimant's complaints." Lester, 81 F.3d at

28  834; Dodrill v. Shalala, 12 F.3d 915, 918 (9th Cir. 1993).  Unless affirmative evidence shows the claimant is

REPORT AND RECOMMENDATION
Page - 11

1    malingering, the ALJ's reasons for rejecting the claimant's testimony must be "clear and convincing."

2    Lester, 81 F.2d at 834.  The evidence as a whole must support a finding of malingering. O'Donnell v.

3    Barnhart, 318 F.3d 811, 818 (8th Cir. 2003).

4          In determining a claimant's credibility, the ALJ may consider "ordinary techniques of credibility

5    evaluation," such as reputation for lying, prior inconsistent statements concerning symptoms, and other

6    testimony that "appears less than candid." Smolen v. Chater, 80 F.3d 1273, 1284 (9th Cir. 1996).  The ALJ

7    also may consider a claimant's work record and observations of physicians and other third parties regarding

8    the nature, onset, duration, and frequency of symptoms. Id.

9          Plaintiff argues the ALJ's credibility analysis was erroneous because it "consisted of listing factors

10   described in the regulations for evaluating disability," and therefore appeared to be "boilerplate, without any

11   true credibility analysis." Plaintiff's Opening Brief, p. 19 (citing to page 3 of the ALJ's decision, Tr. 14).

12   Plaintiff further asserts the ALJ made only a "blanket assertion" regarding his credibility, by merely stating

13   that he was "not entirely credible in light of information contained in the medical reports and other evidence

14   of record." Id. at p. 20; Tr. 14.  This, however, is not an accurate description of what the ALJ actually

15   found regarding plaintiff's credibility.

16         A determination that a claimant's complaints are "inconsistent with clinical observations" can satisfy

17   the clear and convincing requirement. Regennitter v. Commissioner of SSA, 166 F.3d 1294, 1297 (9th Cir.

18   1998).  Here, the ALJ found that plaintiff's medical examinations were "not consistent with his purported

19   limitations." Tr. 17.  This statement came after a lengthy evaluation of the medical evidence in the record

20   concerning plaintiff's mental and physical impairments. Tr. 14-17.  As discussed above, the ALJ did not err

21   in evaluating that evidence, which he properly found indicated much less severe limitations than has been

22   claimed.  Thus, the ALJ did not err in discounting plaintiff's credibility for this reason.

23         Failure to assert a good reason for not seeking, or following a prescribed course of, treatment, or a

24   finding that a proffered reason is not believable, "can cast doubt on the sincerity of the claimant's pain

25   testimony." Fair v. Bowen, 885 F.2d 597, 603 (9th Cir. 1989).  On the other hand, if the claimant provides

26   evidence of a good reason for not taking medication, his symptom testimony cannot be rejected because he

27   failed to do so. Smolen, 80 F.3d at 1284.  Here, the ALJ found as follows:

28          The claimant has declined suggested treatment, saying that he does not want pain
            management – he wants his problems to be fixed.  Thus, he has in fact declined to

1    cooperate with prescribed treatment.

2    Tr. 17.  In addition, the ALJ noted plaintiff "has refused anti-inflammatory medication and has declined

3    most treatment." Tr. 16.

4         Plaintiff argues he declined anti-inflammatory medication only because it was not effective for his

5    pain, and that the record does not indicate he refused to participate in his plan of treatment.  A review of the

6    record indicates otherwise.  It is true plaintiff has reported that his prescribed medications, as well as

7    manipulative treatment he has received, has not been effective. Tr. 201, 214, 222-23, 235, 273-75.  The

8    record shows, however, that at other times he did receive significant benefits. Tr. 199, 203, 211, 218, 224,

9    260-63, 274, 281.  Dr. Takacs, furthermore, stated he did not think plaintiff made all of the manipulative

10   treatment visits that had been scheduled for him. Tr. 220.   Dr. Dorman also noted that plaintiff had been

11   "quite negligent" about his prescribed exercises. Tr. 261.

12        There also is substantial evidence in the record to indicate that conservative treatment would have

13   helped plaintiff return to work, but that he just did not believe what his physicians were telling him. Tr. 210,

14   217, 234, 248, 257-59, 261-63, 281-82, 284, 288.  Thus, for example, Dr. Mayhall stated that with

15   conservative treatment, such as exercise, strengthening, conditioning, and activity modification, plaintiff

16   could expect to see a "better than 50% improvement" in his back condition.[2] Tr. 259.  Accordingly, the ALJ

17   did not err in discounting plaintiff's credibility for this reason as well.

18        To determine whether a claimant's symptom testimony is credible, the ALJ may consider his or her

19   daily activities. Smolen, 80 F.3d at 1284.  Such testimony may be rejected if the claimant "is able to spend a

20   substantial part of his or her day performing household chores or other activities that are transferable to a

21   work setting." Id. at 1284 n.7.  The claimant need not be "utterly incapacitated" to be eligible for disability

22   benefits, and "many home activities may not be easily transferable to a work environment." Id.  The ALJ

23   discounted plaintiff's credibility in part because of his activities of daily living, finding that:

24

25        [2]Plaintiff cites to Byrnes v. Shalala, 60 F.3d 639, 641 (9th Cir. 1995) for the proposition that the ALJ "must 'examine
26   the medical conditions and personal factors that bear on whether [a claimant] can reasonably remedy' his impairment." (citations
     omitted).  What the Ninth Circuit actually stated in that decision, however, was that the ALJ must do so "before basing a denial
     of benefits on noncompliance." Id. (emphasis added).  Here, the ALJ did not base his denial of benefits on plaintiff's
27   noncompliance, but rather properly used that noncompliance as evidence of plaintiff's lack of credibility.  Byrnes also is factually
     distinguishable from this case.  In Byrnes, the ALJ "made no finding" that the claimant was noncompliant with his treatment
28   program or that he "'lacked good cause for failing so to comply.'" Id. (citations omitted).  Here, again, the ALJ did make such
     findings.

> The claimant told Dr. Mayhall that he went shopping, played his keyboard, did exercises, and walked his dog. He apparently is involved in composing music. He has reported that he does some household chores. He indicated that he did not go shopping, but this was due to a lack of money, not because of his impairments.

Tr. 16. Plaintiff argues there is no indication in the record that these activities consumed a substantial part of his day or that they are easily transferable to a work environment. The undersigned agrees. See Tr. 81-88, 224-25, 240, 254, 284. Nevertheless, the mere fact that one of the ALJ's reasons is not legitimate, does not render the credibility determination invalid, as long as it is supported by the substantial evidence, as it is here. Tonapetyan, 242 F.3d at 1148.

III.     The ALJ Properly Assessed the Testimony of Plaintiff's Mother

Lay testimony regarding a claimant's symptoms "is competent evidence that an ALJ must take into account," unless the ALJ "expressly determines to disregard such testimony and gives reasons germane to each witness for doing so." Lewis v. Apfel, 236 F.3d 503, 511 (9th Cir. 2001). Plaintiff argues the ALJ failed to give germane reasons for discrediting the testimony of his mother. With respect to that testimony, the ALJ found as follows:

> The claimant's mother, Sharon Sumner, testified that the claimant was concerned about his back. She stated that he did nothing around the house and stayed in bed most of the time. However, he went to the library from time to time. Prior to the accident, he had been very active and he had gotten much worse over the prior two years. She said that the claimant could not go to the opera anymore because he could not sit very long. He had expressed some anger, thinking that his doctors had not been able to help. Her testimony is considered credible to the extent that it is consistent with the claimant's medical reports reviewed above.

Tr. 17. Plaintiff asserts the ALJ gave no specificity as to which testimony he found credible and which he found not credible, and did not detail with respect to what medical evidence the testimony of plaintiff's mother was inconsistent.

In rejecting lay testimony, however, the ALJ need not cite the specific record as long as "arguably germane reasons" for dismissing the testimony are noted, even though the ALJ does "not clearly link his determination to those reasons," and substantial evidence supports the ALJ's decision. Lewis, 236 F.3d at 512. The ALJ also may "draw inferences logically flowing from the evidence." Sample, 694 F.2d at 642. As discussed above, the ALJ gave a detailed evaluation of the medical evidence in the record, and properly found it to be inconsistent with plaintiff's claims of disabling limitations. Lewis, 236 F.2d at 511; Vincent on Behalf of Vincent v. Heckler, 739 F.3d 1393, 1395 (9th Cir. 1984) (ALJ may discount lay testimony if it

1  conflicts with medical evidence).  Accordingly, the ALJ did not err in finding the testimony of plaintiff's

2  mother to be credible only to the extent that it is consistent with that evidence.

3  IV.    The ALJ Properly Found Plaintiff Not Disabled at Step Five of the Disability Evaluation Process

4          If a claimant cannot perform his or her past relevant work, at step five of the disability evaluation

5  process the ALJ must show there are a significant number of jobs in the national economy the claimant is

6  able to do. Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999); 20 C.F.R. §§ 404.1520(d)-(e),

7  416.920(d)-(e).  The ALJ can do this through the testimony of a vocational expert or by reference to the

8  Commissioner's Medical-Vocational Guidelines (the "Grids"). Tackett, 180 F.3d at 1100-1101; Osenbrock

9  v. Apfel, 240 F.3d 1157, 1162 (9th Cir. 2000).

10         An ALJ's findings will be upheld if the weight of the medical evidence supports the hypothetical

11  posed by the ALJ. Martinez v. Heckler, 807 F.2d 771, 774 (9th Cir. 1987); Gallant v. Heckler, 753 F.2d

12  1450, 1456 (9th Cir. 1984).  The vocational expert's testimony therefore must be reliable in light of the

13  medical evidence to qualify as substantial evidence. Embrey v. Bowen, 849 F.2d 418, 422 (9th Cir. 1988).

14  Accordingly, the ALJ's description of the claimant's disability "must be accurate, detailed, and supported by

15  the medical record." Embrey, 849 F.2d at 422 (citations omitted).  The ALJ, however, may omit from that

16  description those limitations he finds do not exist. Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir. 2001)

17  (because ALJ included all limitations that he found to exist, and those findings were supported by

18  substantial evidence, ALJ did not err in omitting other limitations claimant failed to prove).

19         The ALJ posed the following hypothetical question to the vocational expert:

20         Assume for this hypothetical, that this individual could lift or carry 40 pounds
           occasionally, 25 pounds frequent[ly].  Would be able to stand 6 of 8 hours or sit 6 of 8
21         hours.  Should only occasionally be required to use ladders, ropes, scaffolds, or to
           stoop, crouch, or crawl.  Would be limited to simple one, two, three step work, because
22         of the distractions of pain and medication possibly.  And should have limited interaction
           with the public.
23
24  Tr. 330.  Based on this hypothetical question, the vocational expert testified that plaintiff could perform the

25  jobs of small parts assembler, routing clerk and electronics assembler. Id.  The ALJ adopted the vocational
    expert's testimony regarding the jobs plaintiff could perform. Tr. 18-19.
26
27         Plaintiff argues the hypothetical question the ALJ posed to the vocational expert was incomplete,

28  because it did not include the limitations of occasional bending and kneeling.  While the undersigned finds

    that it was error not to include these limitations in the hypothetical question, given the fact that the ALJ had

REPORT AND RECOMMENDATION
Page - 15

1   included them in his assessment of plaintiff's residual functional capacity, that error was harmless. See

2   Batson v. Commissioner of the Social Security Administration, 359 F.3d 1190, 1197 (9th Cir. 2004)

3   (applying harmless error standard); Curry v. Sullivan, 925 F.2d 1127, 1131 (9th Cir. 1990) (holding ALJ

4   committed harmless error).

5          Each of the jobs described by the vocational expert are defined in the Dictionary of Occupational

6   Titles ("DOT"). See DICOT # 706.684-022 (Assembler, Small Products I), # 222.687-022 (Routing Clerk),

7   # 726.261-010 (Electronics Assembler, Developmental), attached to Plaintiff's Reply Brief as Exhibits "A,"

8   "B" and "C."  The DOT describes the physical demands required by each of these jobs. Id.  In terms of

9   postural limitations, the DOT lists climbing, balancing, stooping, kneeling, crouching, and crawling. Id.  For

10  each of these activities, the DOT states "Not Present - Activity or condition does not exist." Id.  Thus,

11  kneeling, whether occasional or frequent, is not required for any of the three jobs.

12         In addition, while it is true the DOT's descriptions of those jobs do not refer to bending, it seems

13  clear that the ability to engage in various postural activities is not a factor in determining the ability to

14  perform the work required.  As such, the ALJ's error in excluding the limitation to occasional bending from

15  the hypothetical question posed to the vocational expert was harmless.  Similarly, while, as discussed above,

16  the ALJ failed to properly address Dr. Takacs' opinion that plaintiff minimize "twisting at the waist," there

17  is no indication that the ability to twist is required to perform the above jobs any more than any other of the

18  postural activities defined by the DOT as being "Not Present."  Accordingly, the ALJ's determination that

19  plaintiff could perform these jobs was proper.

20                                    CONCLUSION

21         Based on the foregoing discussion, the court finds the ALJ properly determined plaintiff was not

22  disabled.  Accordingly, the ALJ's decision is affirmed.

23         DATED this 2nd day of August, 2005.

                                        Karen L. Strombom
                                        United States Magistrate Judge